NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 170640-U

NO. 4-17-0640

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 21, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| REGINALD DEANGELO COOPER, | ) | No. 17CF483 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John Casey Costigan, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Steigmann and Justice Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's conviction for being an organizer of a continuing financial crimes enterprise is affirmed where the evidence demonstrated an agreement between defendant and other individuals to commit forgery.

¶ 2    In August 2017, a jury found defendant, Reginald Deangelo Cooper, guilty of financial institution fraud (720 ILCS 5/17-10.6(i) (West 2016)). The trial court sentenced him to 12 years in prison. He appeals directly from his conviction, claiming the State failed to prove him guilty beyond a reasonable doubt. In particular, he claims the evidence was insufficient to prove he and any other individual agreed to commit forgery on at least three separate occasions within an 18-month period. For the reasons that follow, we affirm defendant's conviction.

¶ 3                              I. BACKGROUND

¶ 4    In May 2017, the State charged defendant with financial institution fraud, alleging he organized a criminal enterprise by knowingly agreeing with another person to commit forgery

on at least three separate occasions within an 18-month period. The evidence presented at defendant's August 2017 jury trial included the following.

¶ 5 Mary Pat Panetti, a fraud investigator with U.S. Bank, testified she compiled the records of all the customers' accounts that were affected "in this fraud." While reviewing group exhibits A through H on the witness stand, Panetti testified that she had gathered the savings and checking account records of four customers: Kelsey Phelps, Justin Crayton, Paris Perry, and Thomas Gardner. Included in the group exhibits were the following documents for each account per customer: (1) a signature card (except for Gardner); (2) the opening deposit information; (3) copies of deposited checks; and (4) the account statements. Panetti also identified group Exhibit I as eight photographs taken from video surveillance of various automated teller machine (ATM) locations during the withdrawal of funds from the customers' accounts. She identified each transaction, the location of the ATM, and the time and date of the withdrawal. She gathered this documentation and submitted the same to the police.

¶ 6 At the conclusion of Panetti's testimony, the trial court read a stipulation to the jury "with regard to several witnesses." The stipulation provided that, if called to testify, Dexter Hebert, Louise Hebert, and Janet Kull would confirm they each held an account at Commerce Bank but none wrote a check or authorized any check to be written from their respective accounts to defendant or any of the named account holders, whom they had never met. The copies of the checks from their accounts did not bear their signatures. They had no knowledge as to how anyone obtained their checks.

¶ 7 Kelsey Phelps, age 19, testified for the State. She said in December 2016, she opened a bank account at U.S. Bank "to help a friend in need of another friend." She said she was "helping" her now ex-friend Semaj Collins, who was "helping" his friend "Flaka" (defendant).

She positively identified defendant in court as the person she knew as Flaka. Phelps said she had known defendant for approximately one week before she was asked to open the accounts. She communicated directly with defendant in person and through Facebook, texting, and phone calls. On the day she opened the account, she went to the bank with defendant, defendant's father (Mike), and Montel Kramer (Phelp's boyfriend). Defendant and Collins had instructed her to "open a checking and a savings account." Defendant gave her $50 to open both accounts.

¶ 8    After Phelps left the bank, defendant instructed her to withdraw the $50 from an ATM. The amount she withdrew was close to $50 but not the full amount. Phelps said she did not feel "right" about opening the account; she had an "uneasy feeling in [her] stomach for a while after it." She said defendant asked her multiple times to open the accounts and she felt pressured to do so.

¶ 9    Phelps was shown copies of two checks deposited into her savings account. Both checks were from Rochelle Derring, written from a TCF National Bank account, in the amount of $180 (exhibit Nos. A3 and A4), and contained the word "loan" in the subject line. She was also shown copies of two checks deposited into her checking account. Again, both were from Derring, written from a TCF National Bank account, in the amount of $200 (exhibit Nos. B3 and B4), and contained the word "loan" in the subject line. Phelps said she did not endorse, deposit, or cash the checks, nor did she borrow money from Derring. However, defendant and Collins told Phelps she would receive $100 "out of it," but she did not receive any money. In fact, she now owes U.S. Bank for the amounts withdrawn. Phelps said her personal identification number (PIN) was written on the documents she had given defendant. Phelps acknowledged the State granted her immunity for her testimony against defendant.

¶ 10        Justin Crayton, age 21, testified that in early January 2017, he was approached by his friend "Mo" about getting "some money in [his] pocket." The next day, Crayton met with "Flaka" (Crayton made an in-court identification of defendant as the person he knew as Flaka), who told Crayton he "could help [him] get some money. All he needed was [Crayton's] help." Defendant told Crayton the only thing he needed to do was open a bank account at U.S. Bank. Defendant gave him money to open a checking and a savings account; he walked to the bank alone. Defendant told him he would give him $400 to $500 for opening the accounts.

¶ 11        Crayton was shown copies of four checks deposited into his accounts. Two checks from Janet Kull, written from a Commerce Bank account, in the amount of $200 (exhibit Nos. C3 and C4), were deposited into his checking account. Each check contained the word "loan" in the subject line. He was also shown copies of two checks deposited into his savings account. Again, both were from Kull, written from a Commerce Bank account, in the amount of $180 (exhibit Nos. D3 and D4), and contained the word "loan" in the subject line. Crayton said he did not endorse, deposit, or cash the checks, nor did he borrow money from Kull. Crayton acknowledged he received immunity for his testimony.

¶ 12        Paris Perry testified she opened a checking and a savings account at U.S. Bank in January 2017 after her boyfriend, Crayton, asked her if she would like to "make a little extra money." She identified defendant in court as the person she had met at Crayton's suggestion. She agreed to open a checking account and a savings account at U.S. Bank. Defendant gave her $50 to split evenly between the two accounts. After she opened the accounts, she was to give him the temporary debit card and the corresponding PIN. She was told she would get between $800 and $1,000 for opening the accounts. Defendant was in the car that picked Perry up to take her to the

bank. Perry said the vehicle depicted in exhibit No. 5 was the vehicle in which she rode to the bank. She did not receive any payment for her participation, and she now owed U.S. Bank $1,300.

¶ 13 Perry was shown copies of two checks deposited into her checking account. Both checks were from Kull, written from a Commerce Bank account, in the amount of $200 (exhibit Nos. E3 and E4), and contained the word "loan" in the subject line. She was also shown copies of two checks deposited into her savings account. Again, both were from Kull, written from a Commerce Bank account, in the amount of $180 (exhibit Nos. F3 and F4), and contained the word "loan" in the subject line. Perry said she did not endorse, deposit, or cash the checks, nor did she borrow money from Kull. Perry acknowledged she received immunity for her testimony.

¶ 14 Thomas Gardner, age 59, testified that on February 1, 2017, a man approached him outside of the Salvation Army shelter at which he was staying in Bloomington. He got in a vehicle (he said he remembered seeing the word Lexus on the steering wheel) with this man and three other individuals. He said it was "hard to tell" if he would recognize the man again. The man told him to open a savings account and a checking account with the $50 he was given. They drove to Springfield, where Gardner opened the accounts as instructed at U.S. Bank. In exchange for his participation, the man was going to pay him $100. He was given $50 after he opened the accounts.

¶ 15 Gardner was shown a copy of a check deposited into his checking account. The check was from Dexter or Louise Hebert, written from a Commerce Bank account, in the amount of $200 (exhibit No. G2), and contained the word "loan" in the subject line. He was also shown a copy of a check deposited into his savings account. Again, it was from Dexter or Louise Hebert, written from a Commerce Bank account, in the amount of $180 (exhibit No. H2), and contained the word "loan" in the subject line. Gardner said he did not endorse, deposit, or cash the checks,

nor did he borrow money from Kull. Gardner acknowledged he received immunity for his testimony.

¶ 16        Bloomington police officer Paul Jones testified that on January 25, 2017, he was dispatched to U.S. Bank in Bloomington on a report of fraudulent activity. When he arrived, he saw a blue Nissan Sentra in the bank's parking lot with four people inside. Defendant was exiting the rear passenger seat. Photographs taken from Jones's body camera (exhibit Nos. 5, 6, 7, 7a, and 8) showing the vehicle and a person who Jones identified in court as defendant were admitted into evidence.

¶ 17        Normal police officer Jason Wood testified that his duties included computer and cellular telephone forensics. He testified as the State's expert witness in the field of historical cell-site analysis, which he described as the analysis of data derived from detailed call records. He analyzed the activity on defendant's phone for the month of January 2017. During that time, defendant's phone connected to towers in Bloomington, Normal, Lincoln, and Springfield. Because defendant's phone was used to make these calls in these areas, the phone could not have been in Chicago as defendant had suggested.

¶ 18        Normal police detective Nicole Bruno, who specializes in the investigation of financial crimes, testified she was assigned to this case and worked in conjunction with Bloomington police detective Todd McClusky. On May 2, 2017, she and McClusky interviewed defendant. The videotaped interview and a typewritten transcript of the interview were admitted into evidence. Defendant denied knowing anyone in Bloomington-Normal besides his father and denied knowing anything about opening accounts or withdrawals from those accounts.

¶ 19        Both parties rested. During his closing argument, the prosecutor proposed to the jury that defendant "got three other—got these four other people, over a course of about a month,

- 6 -

to open these accounts and help him commit the forgeries so he could profit from them, because he was their boss, because he was in charge." Defendant argued the State failed to prove defendant organized or supervised anything. Nevertheless, the jury found defendant guilty.

¶ 20　　　　On August 25, 2017, the trial court conducted a sentencing hearing. First, the court denied defendant's motion for a judgment notwithstanding the verdict on the grounds of insufficient evidence. Next, with regard to sentencing, the court considered evidence in aggravation, factors in mitigation, defendant's presentence investigation report, and defendant's statement in allocution. The court sentenced defendant to 12 years in prison on this Class X offense plus restitution and fines, fees, and costs.

¶ 21　　　　This appeal followed.

¶ 22　　　　　　　　　　　　II. ANALYSIS

¶ 23　　　　Defendant claims the State failed to prove the elements of the charged offense beyond a reasonable doubt. The dispute does not center around the facts as much as it does the definitions of the terms used in the statute and the charging instrument. Specifically, defendant contends the State failed to prove the existence of an agreement between him and anyone else to commit forgery. We disagree.

¶ 24　　　　Due process requires proof beyond a reasonable doubt to convict a criminal defendant. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). In reviewing a challenge to the sufficiency of the evidence, it is not a reviewing court's role to retry the defendant; rather, we must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found each of the essential elements of the crime beyond a reasonable doubt. *People v. Ward*, 215 Ill. 2d 317, 322 (2005). The trier of fact is responsible for evaluating the credibility of the witnesses, drawing reasonable inferences from the evidence, and resolving any

inconsistencies in the evidence, and a reviewing court should not substitute its judgment for that of the trier of fact. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). Ultimately, a reviewing court will not reverse a defendant's conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to his guilt. *People v. Cox*, 195 Ill. 2d 378, 387 (2001).

¶ 25 The State charged defendant with one count of being an organizer of a financial crimes enterprise, alleging he, "with the intent to commit the offense of forgery involving a financial institution, *agreed with another person to the commission of that offense* on at least three separate occasions [*sic*] within an [18-]month period, and with respect to the other individuals, the defendant occupied a position of organizer or supervisor of the conspiracy[.]" (Emphasis added.) See 720 ILCS 5/17-10.6(i) (West 2016).

¶ 26 Section 17-10.6(i) of the Criminal Code of 2012 sets forth the offense of being an organizer of a continuing financial crimes enterprise. 720 ILCS 5/17-10.6(i) (West 2016). In order to sustain a conviction for that offense, the State must establish that the defendant agreed with one or more persons to commit three or more felony offenses involving a financial institution within an 18-month period and that the defendant "occupie[d] a position of organizer, supervisor, or financier or other position of management" with respect to the other participants in the conspiracy. 720 ILCS 5/17-10.6(i) (West 2016). In this case, the predicate felony offense that formed the basis for defendant's conviction for being an organizer of a continuing financial crimes enterprise was forgery.

¶ 27 A person commits forgery when, with intent to defraud, he or she knowingly makes a false document or alters any document to make it false and that document is apparently capable of defrauding another. 720 ILCS 5/17-3(a)(1) (West 2016). A person may be guilty of a "false making" of an instrument within the meaning of "forgery" where the instrument is false in any

material part and calculated to induce another to give credit to it as genuine and authentic, notwithstanding fact that person signs and executes the instrument in his own name. *People v. Mau*, 377 Ill. 199, 202-203 (1941). Forgery does not always involve a false signature, but also includes the false making of a writing when that writing is done with the intent to damage or defraud any person. *People v. Kubanek*, 370 Ill. 646, 650 (1939).

¶ 28      The statute, as did the indictment against defendant, used the word "conspiracy." A conspiracy is defined as an agreement to commit a criminal act or acts. *People v. Caraga*, 2018 IL App (1st) 170123, ¶ 37. "To make a *prima facie* showing of a conspiracy, the State must establish that (i) two or more people intended to commit a crime, (ii) they engaged in a common plan to accomplish this goal, and (iii) an act or acts were done by one or more of them in furtherance of the conspiracy." *Id.* The question then is whether the State sufficiently proved the existence of an agreement or a conspiracy to commit forgery.

¶ 29      The evidence presented at trial demonstrated that Phelps, Crayton, Perry, and Gardner *agreed* to open bank accounts (accounts they never intended to use as their own) in furtherance of defendant's objective and at defendant's direction. Although they did not know exactly what defendant was intending to do with the accounts, nor were they involved in cashing or depositing fraudulent checks into their accounts, they nevertheless *agreed* to open shell accounts with the intent to defraud the bank in exchange for compensation from defendant. They each knowingly opened a deceptive account, intending to "induce another to give credit to it as genuine and authentic," while having no intent of holding the accounts as their own. It is of no consequence that each person opened the account in his or her own name. See *Mau*, 377 Ill. at 203 (a defendant may be guilty of forgery when he falsely makes an instrument, even in his own name, which is calculated to induce another to believe it to be genuine and authentic when it is actually false and

deceptive). The bank, relying on the good faith of these individuals, opened the accounts and distributed debit cards to each.

¶ 30          Every person who is guilty either of making and forging or uttering and passing, or attempting to utter and pass, under the conditions named in the statute, is guilty of forgery. *People v. Katz*, 356 Ill. 440, 444 (1934). The words "utter" and "uttering" in this context mean, "substantially, 'to offer'." *Id.* at 445. In order to open the bank accounts, each individual signed a signature card, knowing he or she would never personally utilize the account but, rather, offering his or her signature seemingly in good faith as if he or she would. Each individual testified he or she opened the account only because he or she was instructed to do so with the promise of compensation.

¶ 31          Given the evidence presented at trial, we find the State presented sufficient evidence to show that defendant organized, recruited, and directed the others to open checking and savings accounts at U.S. Bank. He gave them the funds to open each account and directed them to release the account numbers and bank-issued debit cards to him. In exchange for the promise of compensation, each individual agreed, even while suspecting that something "wasn't right." Regardless of the uneasiness, each person agreed to open the account having no intention of using the account for their own individual use. Instead, they knowingly opened these false accounts at defendant's request knowing defendant had ulterior motives and that the accounts would not be used as intended by the bank.

¶ 32          Viewing the totality of the evidence in the light most favorable to the prosecution, including the testimony provided by Phelps, Crayton, Perry, and Gardner, and within the context of the applicable statutes, we conclude a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt of being the organizer of a financial crimes enterprise.

¶ 33                            III. CONCLUSION

¶ 34        For the reasons stated, we affirm the trial court's judgment.

¶ 35        Affirmed.